# WHEELING.

## STERLING ORGAN CO. *v.* HOUSE.

Submitted June 6, 1884—Decided November 15, 1884.

1. A., a manufacturer of organs, enters into an agreement with B., whereby B. is to engage in the business of selling organs manufactured by A. and is to introduce them into use in a given territory, and A. is to furnish him, whenever he may need organs for re-sale in this territory, with all the organs he may need for this purpose, selling them to him at reasonable rates, this arrangement to continue so long as either party choose and till the party desiring to put an end to this arrangement shall give to the other reasonable notice of his purpose of terminating such arrangement. A., the manufacturer, violates this agreement by refusing to furnish B. with organs that he needed for re-sale in this territory, without having first given to B. reasonable notice of his purpose to terminate the arrangement, whereby B. suffered damages. A., the manufacturer, then sues B. for the price of certain organs which he had purchased of A. under this arrangement, and which B. had not paid for. The action brought was an action of *assumpsit.* HELD:

  I. The defendant could not, under section 5 of chapter 126 of Code of W. Va. file a special plea alleging any failure in the consideration of the contract sued upon, as the contracts sued upon were those made in the purchase of the several organs, which had not been paid for.

  II. The defendant could not, independent of this statute, file at common law a special plea to have the damages, which he

sustained by the breach of this agreement, *recouped* against the amount due to the plaintiffs on the organs purchased.

III. The defendant had a right to have the damages he thus sustained *recouped* against the plaintiff's claim on the trial of the general issue of *non assumpsit*, provided he filed with his plea of *non assumpsit* a notice, that on the trial of the case he would claim to have the damages, which he had sustained by the plaintiffs' breach of the agreement, *re-couped*. (p. 79.)

2. Such an agreement is a valid one, though but verbal, as it does not come within the statute of frauds requiring an agreement, which is not to be performed within a year, to be in writing. (p. 97.)

3. In the case stated in syllabus 1 the agreement is violated by the refusal of the manufacturer A. to sell and deliver to B. certain organs, which B. wanted for the purpose of resale in the specified territory, A., not having given to B. the reasonable notice required by the agreement before he put an end to their arrangement. When the agreement was thus violated, B. asked A. to sell and deliver to him ten organs at once for his immediate need. A. without in any way replying to this request sent pursuant to this order of B. three of the ten organs, which B. had so ordered, and B. supposing that the other seven organs would speedily arrive, continued the men and wagons and horses, which he had employed in selling and delivering organs, in his employment for a week at his own expense, these men and wagons and horses being idle during this week. In the *recoupment* of damages for this breach of his agreement by the plaintiff, if the jury believe from the evidence, that, had these seven organs been sold and delivered promptly by the plaintiff, A. to the defendant, B., they would all have been sold and delivered to persons B. or his agents had seen and had a prospect of selling to before B. ordered them, during the week that his men and wagons were idle and without any additional expense beyond what he, B., actually incurred, the true measure of the defendant, B's. damages to be *recouped* is the difference between the cost of these seven organs, had they been sold and delivered promptly by A., and the price, which B. would have recovered for them, if he had delivered them to the purchasers from him. (p. 91.)

4. In order that a contract may be regarded as having been made with reference to a usage of trade, such usage must be certain, general, known, reasonable and not repugnant to the contract or the rules of law; and if such a usage is proposed to be proven, and it appears to the court that it is unreasonable or repugnant to the contract or to the rules of law, the court may properly exclude such proof from going to the jury. (p. 96.)

5. A rule of a circuit court "that instructions to a jury will not be

entertained or considered, unless submitted before the conclusion of the argument of the case," is a reasonable rule and tends to the promotion of justice and should be enforced, unless in a particular case there exist peculiar circumstances, which would render the enforcement of this rule unjust to one of the parties, and in such a case the court ought to disregard the rule and grant or refuse instructions, though asked too late under the rule (p. 97.)

GREEN, JUDGE, furnishes the following statement of the case :

On November 24, 1882, the Sterling Organ Company, a corporation of the State of Connecticut, brought an action of *assumpsit* in the circuit court of Ohio county, West Virginia, against C. A. House. The declaration contained the common counts only for work and labor, for goods sold and delivered, for monies lent and advanced to and paid, laid out and expended for the defendant, for monies had and received by the defendant for the use of the plaintiff, and a general *indebitatus assumpsit* count. It was in the usual form of such a declaration, and with it was filed the following bill of particulars :

" Seventeen organs bought by the defendant of the plaintiff between March 6, 1882, and April 21, 1882, at prices ranging from $43.00 to $93.00, and aggregating $1,110.50, subject to a credit of $500.00 paid April 21, 1882, leaving due $610.50 with interest from April 21, 1882."

The defendant pleaded *non assumpsit*, and issue was joined. He also tendered two special pleas and asked leave to file a notice of *recoupment*, which though objected to was allowed to be filed. The first special plea was in the following words:

" And the defendant, C. A. House, by his attorney, comes and defends the wrong and injury, &c., and for further plea says that the said plaintiff ought not to have or maintain its aforesaid action against the defendant, because, he says, that heretofore, to-wit : On the 24th day of July, 1880, plaintiff was a manufacturer of organs, and an agreement was then entered into between said plaintiff and defendant whereby, in consideration of defendant becoming the agent of the plaintiff and undertaking to buy from it organs for re-sale, as hereinafter set forth, and to introduce the said organs, manufactured by the plaintiff, in the territory hereinafter m en tioned, the said defendant was, by the plaintiff, constituted

the exclusive agent of the plaintiff for the sale of its organs within certain territory, that is to say, that part of the State of West Virginia, north of the Baltimore and Ohio railroad, and including the counties through which it runs, up to the Maryland line, together with the counties of Washington and Greene, in the state of Pennsylvania, and by the said agreement, and for the consideration aforesaid, the plaintiff undertook and promised the said defendant to sell and deliver at certain fixed prices to defendant for re-sale by him within the territory aforesaid, so many of the organs made by plaintiff as defendant should need for the purpose of re-sale within said territory, for so long a time as said defendant should be successful in the business of dealing in said organs.  Defendant further says, that after the making of the said agreement, said defendant, in consideration of said agreement, and in compliance with the terms thereof, bought from said plaintiff a large number of the organs so manufactured by them, and among such organs, certain organs which are the same goods and merchandise in the plaintiff's declaration mentioned as sold and delivered to defendant, and which goods and merchandise defendant says were purchased by him in consideration of the aforesaid promise and agreement of the plaintiff Defendant further says that he afterwards, to-wit: On the said 24th day of July, 1880, and during a long period thereafter, relying on said promise and undertaking of the plaintiff, went to great labor, trouble and expense in introducing and making known the organs of plaintiff's manufacture to purchasers and others in the territory aforesaid, by means of the labor, exertions and services of the defendant himself, and of men and teams employed by him, and other means, at an expense to defendant for a large sum of money, that is to say, the sum of $1,000.00; and that at the time of the breach by the plaintiff, as hereinafter set forth, of its said promise and agreement, said defendant had ready in said territory men and teams employed by him at great expense to aid in the further introduction of said organs in said territory.

" Defendant says that from the time of the making of said agreement until the breach thereof on the part of the plaintiff, as hereinafter stated, he was successful in the business of dealing in said organs, and in all things fulfilled and per-

formed on his part said agreement, and but for the said breach on the part of the plaintiff, would have been from that time hitherto successful in the business of dealing in said organs.

" Defendant further says, that said plaintiff, disregarding its said promise and undertaking aforesaid, to-wit: On the 22nd day of April, 1882, refused to permit defendant to act longer as the agent of plaintiff in said territory and constituted another person, to-wit: one Hamilton, its agent, and sold, shipped and delivered to said Hamilton organs of plaintiff's manufacture for sale in said territory, and refused and failed to sell and deliver to defendant any of the organs manufactured by plaintiff. And defendant further says, that by reason of such refusal of the plaintiff, the labor and services of defendant and his salesmen and teams theretofore rendered, and the other expenses theretofore incurred by defendant in the introduction of said organs as aforesaid, became and were wholly lost and useless to defendant, and he was damaged thereby in the sum of $700.00 and the other salesmen and teams of defendant then ready for further service in introducing said organs of plaintiff in said territory were compelled to remain idle for a long time, that is to say, for one week, at a further expense and loss to defendant of $121.00.

" And said defendant says, that by reason of the promises aforesaid, the said defendant has sustained damages amounting in the whole to a large sum of money, to-wit: the sum of $821.00, which is still due and unpaid and owing from the plaintiff in this action to this defendant, and which is here pleaded as a set-off against the plaintiff. And this defendant is ready to verify."

The second special plea was the same as the first, except that the date of the agreement between the plaintiff and the defendant instead of being alleged to be on the 24th of July, 1880 is alleged to be on the 13th day of March, 1882. The consideration for the promise of the plaintiff to the defendant is stated as in the first plea, except that the number of organs the plaintiff agreed to sell to the defendant instead of being as stated in the first speacial plea "so many organs of the plaintiffs' manufacture as the defendant should need for the purpose of sale within the territory aforesaid for so long a time, as said defendant should be successful in the business

of dealing in said organs" was "so many organs of the plaintiff's manufacture as the defendant should need for the purposes of re-sale in said territory during the season then ensuing, that is to say from the day and year last aforesaid till the first day of January, 1883." The breach of the agreement is there set out substantially as in the first special plea, and the damages are laid in the aggregate at $221.00 instead of at $821.00, as in the first special plea. Both these special pleas were sworn to by the defendant. The filing of these two special pleas were objected to by the plaintiff; but on May 4, 1883, the court overruled these objections and permitted these two special pleas to be filed, to which rulings the plaintiff excepted; and thereupon the plaintiff replied generally to each of the pleas, that it was not true. The notice of *recoupment* filed was in the following words:

"The plaintiff will take notice that upon the trial of this action the defendant will seek to recoup damages to the amount of the plaintiff's claim, by reason of the plaintiff's breach of the contract, under which plaintiff's claim arises. Such breach being a failure on the part of the plaintiff to furnish and sell to the defendant such organs of its manufacture as the defendant needed, while engaged in selling and introducing the organs of plaintiff's manufacture, and while the defendant was successful in such business, such damages including amounts expended by the defendant in the introduction of such organs, and amounts expended by defendant in paying and maintaining salesmen and teams, who were idle by reason of such failure on the part of the plaintiff."

On September 18, 1883, the issues were tried by a jury, who on the next day found a verdict for the plaintiff and assessed its damages at $540.25. The plaintiff and defendant each moved the court to set aside this verdict; but subsequently the defendant withdrew his motion and objected to the granting of the plaintiff's motion; and it being argued and maturely considered by the court on January 30, 1884 the court refused to grant a new trial on the plaintiff's motion and rendered a judgment for the plaintiff against the defendant for $340.25 with interest thereon from September 19, 1883 till paid and its costs. The plaintiff excepted to the action of the court in overruling its motion for a new trial; and in the bill of

exceptions all the evidence and proceedings given or arising during the trial are set out at length occupying 114 manuscript pages.

If we look only at the parol evidence of the plaintiff, the case proven is substantially this. It was admitted by the defendant that the seventeen organs named in the bill of particulars were purchased at the dates set out in that bill and at the prices therein named; and that the aggregate price of them was $1,110.50, on which nothing had been paid except $500.00 on April 21, 1882, leaving then due $610.50 as stated in bill of particulars. The contract between the parties referred to in the special plea was not a formal contract but one to be deduced from a conversation between an agent of the plaintiff and the defendant, which took place at the residence of the defendant in Wheeling some time in the year 1880. The defendant was a dealer in organs and prior thereto, in the year 1879, had purchased from time to time a few organs of the plaintiff, a manufacture of organs in Connecticut. Some time in 1880 an agent of the plaintiff was in Wheeling and called on the defendant and had a conversation of considerable length with him. No one was present but these two parties. The defendant, while he does not state that any formal contract was made, says that he understood from this conversation, that the plaintiff was desirous, that the defendant should deal more largely in the organs of the plaintiff than he had theretofore done, and to induce him to do so, proposed to give him an exclusive right to sell the organs of the plaintiff in the territory in West Virginia specified in the special pleas and also the privilege but not the exclusive privilege of selling in certain counties in Pennsylvania. The defendant agreed to engage in the business of selling the organs of the plaintiff's manufacture in this territory, if the agency was made permanent; and the agent of the plaintiff agreed that it should continue so long as the defendant should be successful in the business.

This agent of the plaintiff on the other hand denies, that the plaintiff through him ever agreed to give any territory to the defendant to be his for the exclusive sale of the organs of the plaintiff's manufacture, or that any time was agreed upon, during which the plaintiff was to furnish the defendant with

organs for re-sale. Neither party asserts, that any fixed price was agreed upon as the price to be paid for the organs, which were to be sold by the plaintiff to the defendant from time to time. In addition to this oral testimony the written correspondence between the plaintiff and defendant to the extent of twenty-seven letters were produced at the trial; and they show to a considerable extent the true understanding of the parties. A number of these letters are here given—being those which throw light on the character of the contract or understanding:

"Oct. 8, 1880.

" *C. A. House:*

" Dear Sir:—We beg to notify you that in accordance with intimation given you by Mr. Blake we have assigned Washington and Greene counties in the State of Pennsylvania to you. Trusting to receive your further orders,

"We remain yours,

"Sterling Organ Co."

"Agency at Wheeling, Oct. 12, 1880.

"*Sterling Organ Co:*

"Gentlemen:—Your favor of Oct. 8, notifying me of the transfer of Washington and Green counties, Pennsylvania, to my territory received. Thanks. Now, if you will keep your organs up to its present standard, or improve a little, I will endeavor to make this transfer operate to your advantage as well as my own. Enclosed please find my check for nine style 40 organs at ($47) as per agreement with Mr. Blake when here ($423.00.)

"I will also order five (5) organs, style (40). Mr. Blake spoke of sending me one of the new style. Please do so at your convenience.

"Very respectfully,

"Ans'd 14. E. 14                C. A. House."

"Derby, Conn., U. S. A., March. 13, 1882.

" *C. A. House:*

"Dear Sir:—With reference to terms for the ensuing season would say that we will make price for style 40, $46.00

cash or $48—4 months time—you in the latter case to give us bankable paper.

"Awaiting your reply,

"We are yours, &c.,

"Sterling Organ Co."

" Derby, Conn., March. 18, 1882.

"*C. A. House:*

"Dear Sir:—Replying to your favor, would say that we can not afford to give ten months time.    We thought that four months, with occasional renewal, if it would be convenient for you, would surely suffice.    We have no objections to your selling in Fayette county now or for the present—the ground belongs to another agency, but we think is not worked very much.

"Our bill clerk sent you corrected bills for the two invoices rendered, in to-day's mail.    He did not know of our correspondence.

"Yours, &c.,

"Sterling Organ Co."

"Derby, Conn., April 21, 1882.

"*C. A. House:*

"Dear Sir:—We take this opportunity to state that we are negotiating for the transfer of our Pittsburg agency from Mellor, Hoene & Hendricks, to S. Hamilton, and should the arrangement be carried into effect, Mr. Hamilton will handle our goods very largely and control a considerable extent of territory, in which we shall be obliged to include the Wheeling agency and about all the territory covered by it.    We regret the necessity of this announcement, as our business relations have been always satisfactory, but in order to secure the thorough working of a large Pennsylvania territory the absorption of the Wheeling section was unavoidable.

"Very truly yours,

"Sterling Organ Co.,

"*O. E. Hawkins.*"

"Agency at Wheeling, W. Va., April 19, 1882.

"*Sterling Organ Co:*

"Gentlemen:—I have been and am still sick, unable to leave my room.

"I sent two teams to-day to Clarksburg, W. Va.   I would like to have you ship twenty (20) style 40 organs to that point at once, marked to me.   Also please ship ten style 40 to Wheeling.

"Enclosed please find my check for $500.   As soon as I can get out I will remit again.

"If you can not send all at once hurry up a part.

"Very respectfully,

"C. A. HOUSE."

"DERBY, CONN., April 22, 1882.

" *C. A. House:*

"DEAR SIR:—Since our letter of yesterday's date we are in receipt of your favor of 19th covering order for twenty (20) style 40 to Clarksburg and ten (10) style 40 to Wheeling. The negotiations intimated in our late letter are practically concluded, and invoices of our goods for Mr. Hamilton are made out.   Early in May he will be prepared to place permanent orders with us and work the entire territory.   We don't wish to shove a lot of instruments on you, should you prefer not to continue the agency through him, and are at the same time anxious to do the fair thing and not cut you off without giving you a chance to make other arrangements and keep your men at work.   If you want some stock to keep you going till you can fix up with him or elsewhere telegraph us, on receipt of this, and we will endeavor to supply your wants.

"Very respectfully yours,

"STERLING ORGAN CO.,

"Check for $500 placed to your credit with thanks.

"O. E. HAWKINS."

The following telegram was sent April 27, 1882, to the plaintiff by the defendant:

"April 27, 1882.

" *To Sterling Organ Co., Derby Ct.:*

"Ship ten, style 40 organs to Clarksburg, W. Va., at once. Cancel all other orders.

"C. A. HOUSE."

"AGENCY AT WHEELING, W. VA., June 4, 1884.

" *Sterling Organ Co:*

"GENTLEMEN:—Your statement received.   I wish to call

your attention to several letters you wrote me in March and
April.    In your letter of March 13 (in answer to one of mine
of a previous date) you assure me that you will furnish me
organs at a certain price during the present season.    On the
strength of this assurance I put men in the field and com-
menced ordering organs for them.    The first you filled, but
on the 19th of April I ordered thirty organs; on the 21st you
notified me that you were negotiating with Hamilton, of
Pittsburg, for this territory.

"I wrote you the condition I was in—men and teams out
and nothing to do, on expense for want of organs.    You then
wrote me you would send me some for the present emer-
gency if I would dispatch for them.    I immediately dis-
patched for ten.    I believe after some delay you sent me three
The rest were expected.    We waited for them, but they did
not come.    We were opening up a comparatively new terri-
tory.    I had a good man down there two months during the
winter laying the foundation for a summer campaign and
our prospects wrere good when yours of the 21st was received.
Now, gentlemen, I would like to know if you are willing to
allow me a reasonable amount for the damages I have sus-
tained.

"Yours truly,

"C. A. HOUSE."

"DERBY, CONN., July 27, 1882.

" *C. A. House:*

"DEAR SIR:—Replying to your favor would say that as
you were at the same time handling another instrument we
had reason to think you could turn yourself to much better
advantage than if you were running one organ alone.    We
were desirous of assisting you all we could; and sent what
we could spare to Clarksburg.    You must have had some
stock at Wheeling, as we heard of you offering some.

"Kindly favor us with an early reply, as we are desirous
of settling up all open accounts as early as practicable after
July 1st.

"You will note also that you have had about sixty days'
time on the bill at cash prices.

"Yours, &c.,

"STERLING ORGAN CO."

The defendant also proved by witnesses, that he had two persons in Clarksburg and its neighborhood during the months of January and February, 1882, whom he hired to go through the adjoining country visiting the rural districts and preparing the people for purchasing organs of the plaintiff's manufacture in the coming spring; that they saw a large number of persons in Harrison county, to whom they showed recommendations of the organs of the plaintiff's manufacture from persons known in that community; and that by so doing they had made a preparation, which would enable the defendant to sell organs of the plaintiff's manufacture rapidly in that section.  On April 19 four men, who had been employed by the defendant, went from Wheeling to Clarksburg with two wagons and four horses to sell and deliver organs of plaintiff's manufacture in that section for the defendant.  When they started the defendant wrote to the plaintiff the above letter dated April 19, 1882, informing it, that he had started these two teams to Clarksburg, and directing the plaintiff to send twenty organs at once to Clarksburg directed to the defendant and also ten organs to him at Wheeling.  Three days afterwards the plaintiff wrote the letter dated April 22, 1882, stating that the plaintiff had concluded arrangements with one Hamilton, who was to take the defendant's place as agent in the territory which the defendant had occupied.  In this letter the plaintiff said he did not under these circumstances wish to shove these thirty organs on the defendant but was "anxious to do the fair thing and not cut him off without giving him a chance to make other arrangements and keep his men at work," and the plaintiff concluded this letter by saying:  "If you want some stock to keep you going till you can fix up with him (Hamilton) or elsewhere, telegraph us on receipt of this, and we will endeavor to supply your wants."  The defendant did accordingly send the telegram of April 27, 1882, directing ten organs to be sent to Clarksburg at once and cancelling all other orders.  The plaintiff on the receipt of this telegram sent three of the ten organs to Clarksburg as directed but never sent the other seven and never wrote nor telegraphed to the defendant that he did not intend sending them.  The defendant expected them all to be sent and kept his two

wagons, four men and four horses on expenses at Clarksburg for seven or eight days doing nothing, they expecting these organs daily. The expenses including the wages of these men, while they were thus idle, amounted to $121.00. The plaintiff's only excuse for not sending these organs was that to send them would be unjust to its other customers. The defendant during the year 1881 sold in this territory named in the special plea 141 organs which he had purchased. Of these twelve were organs not of the plaintiff's manufacture; all the rest were of the plaintiff's manufacture, as he had made the plaintiff's organs a specialty according to his promise. His profit on the sale of an organ after deducting all expenses was about $20.00, and the price at which he sold each of the plaintiff's organs, over what it cost him, averaged about $50. The item of $700.00 damages claimed by the defendant in the first special plea was made up, he stated in answer to a question propounded by the plaintiff's counsel, as follows:

"My method of figuring that up would be the number of sales I would loose that I would otherwise have had if I had kept the agency and they had supplied me, owing to their refusal to supply me. I estimate my sales in this way. An advantage of an organ already established I estimate in this way. We calculate that one-third of our sales comes directly or indirectly through parties we have already sold to. A party we can sell to in that way costs us but little to sell it, because we ship it direct to the party and the expence is only in the delivery of the instrument. Say one-third of 140 sales comes to us in that way; estimate the net proceeds of an organ to be $20.00 that would be $900.00."

This testimony the plaintiff asked the court to exclude from the jury, on the ground that this $700.00 was entirely prospective damages. The plaintiff also asked that all the parol testimony of the alleged contract between the plaintiff and defendant be excluded. The court refused to grant either of these requests. The plaintiff offered to introduce witnesses to give evidence to the effect that there was a usage prevailing between manufacturers of organs and their agents, such as the defendant, whereby agencies could be discontinued or terminated at the pleasure of either party, unless otherwise expressly agreed, and also offered to read two

depositions given by two parties, who testified, that they knew of the existence of such a usage or custom between the manufacturers of organs and their agents, such as the defendant.   But the court refused to permit the evidence to be given or their depositions to be read; and the plaintiff excepted to this ruling of the court and took a separate bill of exceptions.   Other evidence was allowed to go to the jury, which was objected to by the plaintiff, but it was not of much importance, and no separate bill of exceptions was taken; and I deem it unnecessary to state these general objections. After the evidence was completed, which was substantially as above stated, and after the argument of counsel was ended, the plaintiff asked the court to give the following instructions to the jury :

"The jury are instructed that if they believe from the evidence that defendant on the 27th day of April, 1882, canceled all former orders to plaintiff for organs and then gave a new order for ten organs, that he is not entitled to recover any damages except as to the ten organs then ordered, and that he is not entitled to recover any damages on account of said order for ten unless the jury further find that plaintiff agreed to fill said order and failed to do so in whole or in part.  And that in the event they find plaintiff accepted said order, then the measure of damages would be the difference between the contract price for so many of said ten organs as plaintiff failed to deliver and the market price at the nearest and most suitable place where said organs could be obtained.

"The jury are further instructed that the defendant is not entitled to any damages by way of set-off unless he proves by a preponderance of testimony that he had a special contract with the plaintiff whereby he was to act as its agent so long as he should be successful in the sale of its organs.

"The jury are instruced that if they find from the evidence that the organs bought by the defendant of the plaintiff during their dealings with each other, including the organs to recover the price of which the suit was brought, were purchased by the defendant for the purpose of re-sale by him, then that all the costs and expenses incurred by the defendant in introducing and re-selling the same must be borne

by him, unless they further find that there was a contract on the part of the plaintiff with the defendant to bear a part or all of such costs and expenses of such introduction and re-sale.

"The jury are further instructed that if they believe from the evidence that at the time of the cessation of dealings between the plaintiff and defendant in April, 1882, there was no contract between the plaintiff and defendant at that time whereby the defendant was bound to continue in the future to act as its agent and buy from it organs for the purpose of re-sale, then that the defendant under the pleas and notice of *recoupment* in this case is not entitled to recover any damage as a set-off against the plaintiff's claim.

"The jury are further instructed, that if they find from the evidence, that on the 21st day of April, 1882, when the plaintiff notified the defendant of the transfer of the territory he had been working, to another man, there was no contract whereby the plaintiff was bound to supply, or the defendant was bound to purchase, organs of the plaintiff's manufacture, then they will not allow defendant any damages as a set-off against plaintiff's claim."

But the court refused to receive, consider or give said instructions, or either of them, to which refusal of the court the plaintiff excepted.

The court's refusal to receive and consider said instructions, was based on the following, adopted and entered as a rule of the circuit court of Ohio county on the 19th day of May, 1877, and which, until and at the trial of this case, had always been observed, and had remained unrevoked by any order of the court, said rule being in the words following:

"11.—Instructions to a jury will not be entertained or considered unless submitted before the conclusion of the argument of the cause."

To the judgment of the circuit court of January 30, 1884, the plaintiff obtained on March 29, 1884, a writ of error and supersedeas from this Court.

*T. J. Hugus*, for plaintiff in error.

*W. P. Hubbard*, for defendant in error.

GREEN, JUDGE:

The first question presented by this record is:   Did the circuit court err in permitting the defendant to file the two special pleas against the objection of the plaintiff?   They were drawn under section 5 of chapter 126 of the Code of West Virginia which is in these words:

"In any action on a contract, the defendant may file a plea alleging any such failure in the consideration of the contract, or fraud in its procurement, or any such breach of any warranty to him of the title to real property or of the title or soundness of personal property, for the price or value whereof he entered into the contract, as would entitle him either to recover damages at law from the plaintiff, or the person under whom the plaintiff claims, or to relief in equity, in whole or in part, against the obligations of the contract; or if the contract be by deed alleging any such matter existing before its execution, or any such mistake therein, or in the execution thereof, as would entitle him to such relief in equities; and in either case alleging the amount to which he is entitled by reason of the matters contained in the plea.   Every such plea shall be varified by affidavits."

This act has been in force in Virginia and in this State from April 15, 1831.   Its object was evidently to save litigation by enabling parties to settle in certain cases all matters in controversy in one suit; and to effectuate this purpose it has been when necessary very properly construed liberally (*Watkins* v. *Hopkins*, 13 Grat. 748, 749); but I do not see how it can be construed so as to include the case attempted to be set up in these two special pleas.   This is an action on a contract; and if the defendant has a right to file these two special pleas under this section, it can only be because these special pleas "allege a failure in the consideration of the contract sued upon, such as would entitle him to recover damages at law from the plaintiff."   The contract sued upon was an agreement that for divers chattels (organs) by the plaintiff sold and delivered to the defendant at his special instance and request, the defendant would pay the plaintiff a certain sum when requested.   These special pleas allege that the real agreement, the basis of the action, was that "in consideration of the defendant becoming the agent of the

plaintiff and undertaking to buy from the plaintiff, a manufacturer of organs, for re-sale organs and to introduce these organs in a certain specified territory the defendant was constituted by the plaintiff its exclusive agent for the sale of its organs in the described territory, and the plaintiff by this agreement promised the defendant to sell and deliver at certain fixed prices so many of these organs as the defendant should need for re-sale in said territory for so long a time, as the defendant should be successful in the business of dealing in said organs, or as the second special plea says, till January 1, 1883; that the organs, the price of which was the subject matter of this action, were bought under this agreement; that relying on the promise of the plaintiff to furnish these organs the defendant went to great expense in introducing them in the territory specified, but that the plaintiff in violation of this agreement would not permit the defendant to act as its said agent after April 22, 1882, and constituted another person its agent and refused to sell or deliver thereafter any of its organs to the defendant, to the damage of the defendant a specified amount.

Stript of all surplusage these special pleas allege, that the contract sued upon was that in consideration that the defendant would be at the expense of introducing in a certain territory certain organs of the plaintiff's manufacture, it would sell to him at fixed prices its organs according to the first special plea, so long as the defendant chose to carry on the business of selling organs in this territory, or according to the second special plea till the first of January, 1883. And this agreement the plaintiff broke by refusing to sell these organs to the defendant after April 22, 1882, whereby the defendant was damaged in specified amounts. In setting out the substance of these special pleas I have omitted all the statement of the pleas about the plaintiff having agreed to engage the defendant as its exclusive agent for the sale of its organs in said territory. For these special pleas show, that there was no understanding, that the defendant should be in any sense the agent of the plaintiff, but simply that the plaintiff would sell him organs at certain specified prices. The plaintiff could not make an agreement, that the defendant should be the only person who should sell these organs

in the specified territory, as this exclusive right of sale in this territory never belonged to the plaintiff, and any one who chose had an indisputable right to sell organs in this territory, so that the whole legal consideration for the defendant's promise to purchase of the plaintiff the organs he needed for re-sale in this territory at certain fixed prices was the promise of the plaintiff, that he would sell these organs to him at fixed prices for so long a time as the defendant chose or till January 1, 1883, provided the defendant would agree to introduce them into this territory. The consideration of the contract sued on was a promise by the plaintiff, that he would continue to sell at certain fixed prices these organs for either a certain time or till the defendant chose to stop purchasing them for re-sale. This promise the pleas allege the plaintiff broke. But this breach of this promise was not within any meaning we can give to section 5 of chapter 126 of our Code "any failure in the consideration of the contract sued upon," for the consideration of the contract sued upon, as set out in the declaration, was an actual sale and delivery of certain organs by the plaintiff; and the contract, as stated in the declaration, on the part of the defendant was that he would pay the plaintiff for those organs sold and delivered.

The special pleas allege no failure in whole or in part of the consideration of the contract as stated in the declaration, but they allege that the defendant was induced to make the contract sued upon by reason of a certain contract or agreement made by the plaintiff with the defendant long prior to the making of the contract sued upon. Now, section 5 chapter 126 of our Code authorizes the defendant to file a special plea only when there is a failure of the consideration of the contract sued upon, and under it the defendant cannot set up the failure of the plaintiff to comply with another obligation on his part, which was not the immediate consideration of the contract sued upon, but was only an inducement for the defendant to enter into the contracts, which were sued upon by the plaintiff, and the consideration of which did not fail in whole or in part. The circuit court therefore erred in permitting the defendant to file these two special pleas; for, as we will presently see, the defendant had no right at

common law to set up the abatement of the damages arising from his breach of his contracts by special pleas, though he had a right to do so on certain conditions under the plea of the general issue. But the plaintiff suffered no damage from this error of the circuit court, and cannot therefore complain of it in this Court, the defendant in his evidence entirely failing to sustain either of these special pleas. The law governing in such a case is: "If any part of the contract proved should vary materially from that which is stated in the proceedings, such variance will be fatal to the party who relies on such special contract." (*James* v. *Mitchell*, 8 W. Va. 568, Syllabus 2; Same Case, 16 W. Va., 263, 264.)

In the case before us the evidence clearly showed, that the plaintiff did not agree to furnish to the defendant organs at any fixed or stipulated prices, as alleged in each of the special pleas, but simply agreed to furnish him with organs as needed by him for re-sale in the specified territory, no price being agreed upon. This was in law the equivalent of agreeing to furnish organs at a fair and reasonable price, which might vary from time to time; and the evidence shows it did so vary. This is a material variation from the contract alleged in the special pleas. The contract as proven further differed most materially from the contracts as alleged in either of these special pleas as to the time, during which by the agreement the plaintiff was to furnish these organs to the defendant, as we will presently show.

The jury, we think, did not base their verdict on the issue joined on either of these special pleas, but must have rendered it on the general issue; and the allowance made by the jury to the defendant as an abatement to the plaintiff's demand, which was fully proven, must have been based solely on the general issue and on the *recoupment* of the defendant's damage under his notice, that he would ask for such *recoupment*. If we find that they were justified by the evidence in allowing the *recoupment* to the extent to which they did allow it, we can not reverse the judgment of the circuit court because of the error of the court in permitting these two special pleas to be filed; for in such case this error would not have been prejudicial to the plaintiff below, who is the plaintiff in error also. But had the jury a right under

the general issue of *non assumpsit* to *recoup* the damages sustained by the defendant by reason of the breach by the plaintiff of the obligations imposed upon it by the contract with the defendant on which this suit is based? Before answering this question we will consider the character of this defense of *recoupment*, its origin and the proper mode of relying upon it in a case of the character of the one before us, if it can be properly applied to such a case.

At common law the defendant had a right to *recoup* the plaintiff's damages in a few instances, when the reduction claimed sprang immediately from the claim relied upon by the plaintiff. This was denominated a *recoupment*. This right was anciently confined within very narrow limits and was indeed little if anything more than a mere right of deducting from the amount of the plaintiff's recovery, on the ground that his damages were really not as great as alleged. This remedy of *recoupment* was of very limited application and was originally so trammeled by technicalities, that it was of but little use, and the term *recoupment* for a time became obsolete; yet the principle was always retained. Recently not only has the term *recoupment* been revived, but the doctrine has sprung into new life. The rigid rules of the common law, which so restricted this right, have yielded to the advance of civilization, and a new vigor has been infused into this remedy; and it is now held that the defendant may *recoup* generally, whenever the demands of both parties spring out of the same contract or transaction; and it opens in this country generally the entire contract or transaction, so far as is necessary to determine the plaintiff's right to damages and the amount of the defendant's cross-claims.

The defense of *recoupment* differs from set-off in several important particulars. First, it is confined to matters arising out of and connected with the transaction or contract, upon which the suit was brought; secondly, it has no regard to whether the claim be liquidated or unliquidated; thirdly, if the defendant's claim exceeds the plaintiff's, he can not in that action recover the balance which was due to him. (*Ward* v. *Fellers*, 3 Mich. 281; *Railroad Co.* v. *Jameson*, 13 W. Va., 837–838). The instances and extent, to which the defendant can exercise this right of *recoupment*, are to a con-

siderable degree unsettled; and the manner of its exercise is also to some extent unsettled. To comprehend the character of the disputes, which have arisen as to the manner of the exercise of this right of *recoupment,* I will quote from the dissenting opinion of Judge Cowen in *Barber* v. *Rose,* 5 Hill 79:

"The rule of *recoupment* has come to us from England accompanied with the remark, that when the quality of the work done at a stated price is to be impeached, notice of the defense is proper. (Lord Ellenborough, C. J., and Lawrence, J., in *Barton* v. *Butler,* 7 East 479). Counsel had complained of surprise and Buller, J., had refused to allow the defense, while Lord Kenyon had allowed it; and the remarks mentioned seems to have been thrown out, first, as a reply to the counsel, and, secondly, as possibly tending to reconcile conflicting decisions of the judges. They probably led the chancellor to say in *Reab* v. *McAlister,* that he considered a like defence perfectly just and equitable when the plaintiff has notice of it. In *Ives* v. *Van Epps,* 22 Wend. 157, the point was raised, but it wast not thought necessary to decide it. I then said notice *may* be necessary; but added that the rejection of the evidence was no part of the want of it. The question has never been much thought of so far as I can discover, nor do I find it has ever become necessary to decide it in any of the cases where it has been mooted. In no English case except *Barton* v. *Butler,* 7 East 479, is the idea of notice suggested. Other decisions have gone forward without any attention to it. (*King* v. *Boston,* 7 East 481, note *a,* A. D., 1789; *Farnsworth* v. *Garrard,* 1 Camp. 38, A. D., 1807; *Okell* v. *Smith,* 1 Stark. Rep. 107, A. D., 1815; *Pountton* v. *Lattimore,* 9 Barn. & Cress. 259, A. D., 1829; *Allen* v. *Cameron,* Tyrwh. 907, Cr. & Mees. 832, S. C., A. D. 1833; *Strut* v. *Blay,* 2 Barn. & Adolph. 450, A. D., 1831; *Recognizing Connard* v. *Gillis,* 7 East 480, 481 and see *Cousins* v. *Baddow,* 1 Gale 305.)

"These cases belong to two classes; one where the defense was partial and the other where it was total. The want of notice was equally disregarded in both. Mr. Leigh in his late book on Nisi Prius (vol. 1 p. 79) delcares the rule in *Barton* v. *Butler,* in these words: 'The defendant should (though he

need not) give notice to the plaintiff of the intended defense; for otherwise he may have given to complainant a surprise, as he may only come prepared to prove the agreement for a specified sum.' I presume he means to be understood as saying that the defendant may or may not give notice at his pleasure; but if he gives none the court will listen more readily to a motion for a new trial on the ground of surprise. That any judge or writer ever intended to lay down the rule as one of pleading I do not believe. There is no color in precedent or principle for saying that a defense striking directly at the whole cause of action need be pleaded in an action of *assumpsit;* and there is still less ground for saying that a partial defense—matter merely to mitigate damages—should be pleaded. A partial defense can never according to our cases be introduced by a plea, and the universal rule both in England and this State is, that where a matter can not be pleaded it may be given in evidence. (*Herkemer Manufacturing and Hydraulic Co.*, v. *Small*, 21 Wend. 273, 277; *Wilmarth* v. *Babcock*, 2 Hill 194, 196.

"I am satisfied that to require notice of a defense by way of *recoupment* in any case would be a departure from principle, from precedent, and all the analogies of pleading. The truth is as remarked by Mr. Justice Bronson in *Butterman* v. *Pierce* the doctrine of *recoupment* is of recent origin. It would not have been surprising therefore, after the remarks in *Barton* v. *Butler*, 7 East 479, had some judges required a plea or notice. The cases fluctuated for some time both in England and in this State on the question of whether the doctrine itself should be received into the law. About as much has been said on the point of notice in one country as in another; but not enough in either to give any serious countenance to the idea that it is necessary. On the whole I am satisfied that the plaintiff's contract having been broken as to time, formed a good ground for claiming damages by way of *recoupment*; and that the defense was admissible under the general issue."

This opinion was rendered in May, 1843, and though a majority of the court held, that " evidence by way of *recoupment* is not admissable, unless notice of the defence be given, but if notice of the defence is given, evidence by way of *re-*

*coupment* may always be given under the general issue of *assumpsit*," yet the real questions to be considered in determining whether *recoupment* can be given in evidence under the general issue in *assumpsit*, and whether in any or in every case, where such defence is put in under the general issue, are so well presented in this opinion of Cowen, judge, that I have thought proper to quote largely from it. The opinion of the majority of the court given by Bronson, judge, 5 Hill 81, is as follows:

" Although it may never have been directly and necessarily decided that the defendant must give notice of his intentions to *recoup* damages, it has often been assumed by the courts of this State that notice must be given ; and such appears to be the general opinion of the profession. Very few cases have fallen under my observation where the defence was attempted without notice. If it must be regarded as an open question, then upon principle, I think notice should be required. The defendant often has an election either to bring a cross action or set up his claim by way of *recouping* damages; and without a notice the plaintiff may be surprised on the trial by a defence which he is wholly unprepared to meet. There can be no hardship on the defendant in requiring him to give notice, while a different rule would be likely to work injustice. I am aware that notice is not necessary when the defence goes to the whole consideration of the promise on which the plaintiff sues. Such a defence shows the plaintiff has no cause of action, and is fairly covered by the plea of *non assumpsit*. But it is not so when, as in this case, the defence admits the plaintiff has a right to sue, and seeks to *recoup* damages on the ground that the plaintiff has failed to perform some stipulation in the contract which was obligatory upon him. In such case notice must be given. But the defence seems to have been rejected on the ground that it was not, in its own nature, admissable. The want of notice was not mentioned in the court below. On this ground I agree that the judgment should be reversed."

These are the views of the New York courts. See *Van Epps* v. *Harrison*, 5 Hill 63. *The Mayor, &c., of the city of Albany* v. *Trowbridge and others*, 5 Hill 71; *Trowbridge* v. *The Mayor of Albany*, 7 Hill 430. It seems to me, that those

courts which held formerly, that *recoupment* was only the right of deducting from the amount, which the plaintiff claimed, on the ground that the damages, which he claimed in an action of *assumpsit*, were too much, and his damages were really not as high as he alleged, would of course hold that the damages so claimed could be reduced under the general issue of *non assumpsit* without any sort of notice to the plaintiff, that such reduction of the amount of the damages claimed by the plaintiff would be insisted on by the defendant in the trial; and that in a case of this character no notice would now be required to be given to the plaintiff. But when a court held, as the courts do now generally, that the defendant may *recoup*, whenever the demands of both parties spring out of the same contract or transaction, and the entire contract is opened, so far as is necessary to determine the plaintiff's right to damages and the amount of the defendant's cross-claim, if the defendant chooses in the action of *assumpsit* brought by the plaintiff to set up such claim by way of *recouping* damages instead of bringing a cross-action, as he might, which is the character of the case before us, such court should hold, that the defendant must give the plaintiff notice, that he will on the trial of the case on the general issue seek to *recoup* such damages; for otherwise not only might the plaintiff be surprised, but it would be difficult or impossible, if a cross-suit was afterwards brought by the defendant against the plaintiff, for him to show that in point of fact the damages claimed by the defendant in the last suit brought by him against the plaintiff were really *recouped* in the first suit. These views we are disposed to adopt as most in accord with reason and justice, and as sustained by the current of authorities. See *Babcock* v. *Trice*, 18 Ill. 420 ; *Robertson* v. *Davenport & Peterson*, 27 Ala. 575 ; *Steamboat Wellsville* v. *Geisse*, 3 Ohio 333 ; *Satchwell* v. *Williams*, 40 Conn. 371 ; *Upton & Co.* v. *Julian & Co.*, 7 Ohio 95 ; *Fowler & Moon* v. *Isaac B. Payne*, 49 Miss. 32 ; *Rogers* v. *Humphrey*, 39 Maine 382 ; *The Methodist Episcopal Church of East Saginaw* v. *Ladd*, 22 Mich. 280.

The defence of *recoupment* should never be set up by a plea. If the defence struck directly at the whole cause of action, it might be made under the plea of *non assumpsit*. It it were a

partial defence, it could not be introduced by plea, and as it cannot be introduced by plea at common law, therefore it may be introduced under the plea of the general issue of *non assumpsit.* (*Baber* v. *Rose*, 5 Hill 80; *Steamboat Wellsville* v. *Geisse*, 3 Ohio 333; *Nichols* v. *Dusenbury*, 2 Com. 283.) It has been decided in a number of cases in the Court of Appeals of Virginia, that prior to the statute of 1831 before quoted no special plea could be filed by a defendant setting up as an abatement or satisfaction of the plaintiff's demand, that he had violated the obligation on his part imposed on him by the contract, or that the consideration failed, or that fraud and deceit had been practiced by the plaintiff in making the contract sued upon, on which his suit was based; in other words that he could not set up the defence of *recoupment* by plea. (*Taylor* v. *King*, 6 Mumf. 358; *Wyche* v. *Macklin*, 2 Rand. 426; *Tomilson's Admr.* v. *Mason*, 6 Rand. 169.)

It was because of decisions of this character that the act of 1831 was passed, which allows special pleas in cases of this sort. The cases named, in which special pleas are allowed, include certain cases, in which, according to the views I have expressed, the facts might have been given in evidence as a defense under the general issue of *non assumpsit* accompanied with notice to the plaintiff. I do not understand this act of 1831 allowing special pleas in certain cases, where the defence is *recoupment,* to exclude the defendant from making this defence under the general issue of *non assumpsit* accompanied with notice thereof to the plaintiff.

Applying the law as thus stated to this case, it seems clear that the defence, which the defendant sought to set up by special pleas, could properly have been set up under the general issue of *non assumpsit* accompanied with notice to the plaintiff of what damages the defendant sought to *recoup.* The circuit court therefore did not err in permitting the defendant to file the notice of *recoupment*, when he pleaded *non assumpsit.* The notice was perhaps not as explicit as it might have been, yet the object of giving it being to prevent surprise on the part of the plaintiff by the introduction of certain evidence by the defendant, and as it is apparent from the record, that the plaintiff was in no manner surprised by want of explicit notice and did not object to any evidence on

this ground, but all the objections to evidence were based on other grounds, and as the case was really tried on its merits, and each party knew well the character of the case sought to be established by the other, we can not set aside the verdict because of any supposed defect in the notice of *recoupment.* If this notice was considered by the plaintiff as so defective that the evidence offered under it operated as a surprise to him, then, where such evidence was offered, it was his duty to object to its introduction on that ground. As he did not do this, this Court will not disturb the verdict, if it be otherwise correct, because of the character of this notice.

Was the verdict otherwise wrong? The arrangement, under which the defendant purchased the organs, for the price of which this suit was brought, was made by a verbal conversation between the agent of the plaintiff and the defendant. No other person was present; and this agent and the defendant differ considerably as to what passed in this conversation. Neither pretended that any formal contract was made. The agreement between them is to be deduced from this conversation and from the long correspondence between them. The most important letters between them are set out at length in the statement of the case. The defendant in his evidence represents, that from this conversation between him and the agent of the plaintiff the agreement can be deduced, that the plaintiff should employ the defendant as its agent to introduce the organs of the plaintiff's manufacture in a certain specified territory, and in doing so was to buy from the plaintiff organs for re-sale in this territory, and in consideration thereof the plaintiff agreed, that he would constitute the defendant his exclusive agent to sell the organs of the plaintiff's manufacture in this specified territory; but he did not pretend to say that any of the organs, which were to be sold, were to be sold by the defendant for the plaintiff, but they, the defendant himself stated, were to be his own organs purchased of the plaintiff. And he did not pretend to say that in this conversation the price, which he was to pay for the organs, was fixed. He states that this arrangement was to continue for so long a time, as the defendant should be successful in selling the organs, which can legally mean only that it was to continue during the pleasure

of the defendant.    This last statement especially was contradicted by the agent of the plaintiff, who stated, that no time was agreed upon, during which this arrangement was to continue; and he interpreted the contract between plaintiff and defendant as one which was to continue during the pleasure of both parties.    Taking the two statements together and reading the numerous letters, which passed between the parties, I think the jury could well have understood the arrangement to have been, that it was to continue for a time in no manner specified or fixed by the parties.    This being the case, the legal effect of such an understanding would be, that either party could at his pleasure put an end to the arrangement upon giving to the other reasonable notice of his intention so to do, and thus avoid the loss which would necessarily fall on one of them by the sudden putting an end to the arrangement by the other; and the correspondence might well be understood as showing that this was the real understanding in point of fact.

The evidence of the defendant himself shows, that in no proper or legal sense of the term was he to be the agent of the plaintiff to sell his organs; for the defendant was to sell none, which he had not previously purchased, and which did not belong absolutely to him as their owner.    So the agreement, that he was to have the exclusive right to sell those organs in a certain territory, in its legal effect amounts to nothing; for the plaintiff could not legally confer on the defendant a monopoly of the business of selling organs in the specified territory.    The defendant did not in his testimony pretend, that the plaintiff had any patent for the organs he was manufacturing; and therefore of course any one had a right to manufacture them and to sell them in the specified territory.    Or if no one else manufactured them, any one who purchased them of the plaintiff's manufacture had a perfect right to sell them in this specified territory or anywhere else.    If the plaintiff had been the patentee of these organs, it might perhaps have conferred on the defendant the exclusive right to sell them in this specified territory, (*Birdsall* v. *Perego*, 5 Blatch. 251); but not being the patentee it certainly had no right to confer on the defendant the exclusive right to sell these organs in a specified territory.

Stripped then of all these irrelevant matters, the arrangement between the plaintiff and defendant was according to its legal effect, as the jury had a right to conclude from the evidence, that the defendant would bear the expense and trouble of making all the necessary arrangements by hiring men and teams to introduce the organs of the plaintiff's manufacture in a certain specified territory, and in consideration thereof the plaintiff would furnish to the defendant at reasonable prices, whenever he might order them, all the organs of the plaintiff's manufacture, which the defendant needed for re-sale in the specified territory, and that this arrangement should continue during the pleasure of the parties, to be put an end to only on reasonable notice by the party so desiring. The evidence shows clearly, that in violation of this agreement the plaintiff put an end to this arrangement suddenly without giving the defendant reasonable notice of its intention to do so; and as a direct consequence of this action of the plaintiff and its refusal or purposed neglect to furnish, as it had agreed to do, organs to the defendant, his two teams and four horses and four men he had hired were idle for seven or eight days, causing an expense to the defendant of $121.00, which sum was entirely lost to him. It is obvious therefore, that this $121.00 would be a fixed sum which would be a minimum sum, which should have been *recouped* by the verdict of the jury against the plaintiff's claim for organs, which it had sold to the defendant, and which were not paid for by the defendant.

The jury might have found it difficult to determine, what was a reasonable notice to be given by the plaintiff to the defendant, before it terminated the arrangement between them. A reasonable notice would have been such time, as would have enabled the defendant to deliver all organs he had sold to purchasers in this territory and complete any contracts with proposed purchasers, which might have been incomplete, when the notice was given, and allow the agents of the defendant to see again persons whom they had seen before, and to whom they had recommended these organs, and ascertain whether or not they would purchase. But it would not include any time to allow the defendant's agents opportunity to visit persons they had not before seen, in order to

induce them to purchase these organs. The jury might also have found it difficult to determine the loss to the defendant occasioned by his inability to deliver the organs he had sold or to complete the sale of those organs which he or his agents had a fair prospect of sale, when this arrangement was terminated. But fortunately in this case the parties by their conduct relieved the jury of much of this difficulty.

As soon as the plaintiff in violation of its contract without any reasonable notice to the defendant of its purpose to do so put an end to their arrangements by its letter dated the 22nd of April, 1882, the defendant on April 27, 1882, telegraphed to the plaintiff to ship to the defendant at Clarksburg ten of its organs at once and canceled all other orders. The jury had a right to conclude from this, that the defendant thought that ten organs were enough to supply persons, to whom he had sold organs, or those whom he was then by his agents chaffering with for the sale of organs, or those persons whom his agents had a reasonable prospect of selling to, and that if that number were furnished him, the time it would take to dispose of and deliver them would be the reasonable time, to which he was entitled, before the arrangement between him and the plaintiff could under this contract be terminated. But instead of supplying these ten organs, as in my judgment if was bound to do, as the time required to dispose of them was not more than the reasonable notice of the terminating of the contract, to which the defendant was entitled, and which the plaintiff by not objecting thereto had tacitly agreed to give, the plaintiff furnished the defendant but three of them, and with no good excuse neglected to furnish the other seven. That the plaintiff regarded this order for ten organs as reasonable, the jury had a right to infer from the fact, that the plaintiff made no complaint, that the number was unreasonably great, and had written but a few days before to the defendant: "If you want some stock to keep you going till you fix elsewhere, telegraph us on receipt of this and we will endeavor to supply your wants." The plaintiff sent but three of the organs telegraphed for in answer to this letter; and in sending these three with no objection to the number ordered they showed they deemed the ten a reasonable number. Had the seven

others been furnished, as they should have been, during the week when the defendant's men and teams were idle waiting and expecting them, they would, the jury may well have believed, have been sold and delivered at a profit to the defendant of about $50.00 on each organ or $350.00 on the seven. His expenses while delivering the organs would have been no greater than they were while he was waiting for them. The loss of the defendant caused by the failure of the plaintiff to supply him with these organs was probably about $350.00; and the plaintiff could not have complained of the jury, had the verdict abated from the claim of the plaintiff as proven this sum of $350.00 as the amount of the defendant's damages, which should have been *recouped.*

A calculation of the amount of the plaintiff's claim as compared with the verdict of the jury will show, that the jury by their verdict actually *recouped* against the plaintiff's claim as the damages of the defendant arising from the breach of the contract about $325.00 only. So that the plaintiff had no right to complain of the verdict; and the court did not err in refusing on the plaintiff's motion to grant a new trial. The defendant at one time also moved the court to grant him a new trial; but he afterwards wisely withdrew this motion. It seems to me, that neither party had any reason to complain of the verdict. It was about as near right as verdicts generally are, when damages have to be assessed. The reason doubtless, why both parties were dissatisfied, was, that each thought the evidence established a different case from that which the jury had a right to think, and which, I presume, did think it established.

According to the plaintiff's view of what was proven by the evidence he had at any time the right to put an end to the arrangement with the defendant without any previous notice. If this view of the plaintiff's were correct, his conduct would not have been a breach of his contract, and the defendant of course would have no right to *recoup* any damages against his claim. But such an understanding of the real agreement between the parties would be a very unreasonable one, as by it the defendant was required to spend a large amount of money in establishing a business, which by the contract, as thus interpreted, the plaintiff had a right to

break up at any moment with certain loss to the defendant. The plaintiff's letter, it seems to me, shows that the plaintiff did not so understand this arrangement.

On the other hand the defendant regarded the evidence as proving that the arrangment was, that the plaintiff was bound to furnish him with whatever organs he might want as long as he might choose to continue in the business of selling organs, while he could discontinue the business whenever he pleased without notice to the plaintiff. This would have been a most unreasonable contract and one, which it would require strong evidence to show that the plaintiff had made. The letters which passed between the parties satisfied the jury doubtless, that this was not the contract between them. If that had been the contract, the defendant would have had the right to *recoup* the damages caused by his inability to deliver the organs, which he had sold or contracted to sell or had then a prospect of selling to known persons, and perhaps, as it is claimed, for the loss he incurred by the improper breaking up of his business, provided such losses were not merely speculative and entirely uncertain.

There is a great diversity of views between the counsel for the plaintiff and the counsel for the defendant as to the measure of damages, if the defendant's views of what was the contract had been established by the evidence. The counsel for the plaintiff insists, that the $700.00 damages claimed in the first special plea cannot be allowed, because they are not the fair, natural and proximate result of the breach of the contract complained of by the defendant, that no allowance of damages could be made because of the supposed profits that might have been realized by carrying on the business of selling these organs, and cites *Howe Machine Company* v. *Bryson,* 44 Iowa 159, *Wilson Sewing Machine Company* v. *Sloan,* 50 Iowa 367, and *McKinnon* v. *McEwan,* 42 Am. 458, and *Washburn* v. *Hubbard,* 6 Lans. 11 to sustain this position. The counsel for the defendant on the other hand insists, that the defendant is entitled to the benefit of his contract; that in its breach by the plaintiff he was entitled to the profits, which he would probably have realized from this contract, had it not been broken by the plaintiff; and that the value of the contract may be ascertained by the judgment or opin-

ion of experienced men.   To sustain this position he cites *Taylor* v. *Bradley*, 39 N. Y. 144; *Jones* v. *Fuller*, 19 S. C. 66; *P. W. & B. R. R. Co.* v. *Howard*, 13 How. 307 344.

I need express no opinion upon what would have been the proper measure of damages, had the defendant's view of what was the contract between the parties been sustained by the evidence in the opinion of the jury.   The view, which I think the jury took of the contract, makes it much less difficult to determine the true measure of the defendant's damages by reason of the breach thereof.   I have stated what I deem the true mode of measuring this damage.   It is not contingent upon future bargains or speculations or a future status of the market or upon the profits which might be made out of continuing the business of selling organs, but is based on the reasonable supposition, that, when this contract was broken by the plaintiff, the defendant by previous bargains or otherwise had then an opportunity of disposing of and delivering in all probability about seven organs, the sale of which, if sold at the prices at which he was selling them, would have brought him $350.00 more than the price he was to give for them.   There is in this no element of conjecture or speculation ; and this mode of measuring the damage from the breach of the contract, if it was such a contract, as I think the jury from the evidence thought it was, is not in conflict with the views of even the counsel for the plaintiff, as above expressed.

But in his brief the counsel for the plaintiff in error in reference to the claims set up in the special pleas for $121.00 damages, says: "The only possible claim for damages, the defendant could insist upon, is the amount of loss resulting from failure to send the ten organs telegraphed for; and no loss on this account can be allowed, unless it is held, that the plaintiff by filling a part of the order made itself liable for the whole, and that if it did make itself so liable, the measure of damages is the difference between the price, at which the plaintiff ought to have furnished them, and the price at which the defendant could have procured them.   The difference upon the evidence most advantageous to the defendant would not have exceeded six dollars per organ or $42.00 altogether."

The rule here laid down for the measure of damages is en-

entirely inapplicable to this case. If the defendant could have at once supplied himself with those seven organs, which he needed; and if the plaintiff had, when he sent him the three organs, informed him he would send him no more and not kept idle the four men employed by the defendant with his wagons and horses at an expense to the defendant of more than $100.00 per week, then there would be a propriety in adopting the measure of damages suggested by the plaintiff's counsel. But it is improbable from the evidence, that within a week after the plaintiff ceased to send organs to the defendant, even had he informed him, that he would not send the other seven organs ordered, the defendant could have got these seven organs at all; and it is probable that his agents would have had to wait so long for them, that their expenses while waiting would have eaten up all the profits on the organs, if they were received and sold.

The court did not err in excluding from the jury evidence of a usage prevailing between manufacturers of musical instruments and their agents, whereby agencies could be discontinued or terminated at the pleasure of either party, unless expressly otherwise agreed. The agencies, which were thus to be terminated by either party without notice, as proposed to be proven, were not agencies but contracts, whereby the manufacturer furnished the purchaser with whatever of his musical instruments he might need for resale in a certain district of country, into which the purchaser undertook to have such musical instruments introduced. Now as I understand the law, a usage to be admissible to explain the intent of parties in a contract must not only be so well settled, so uniformly acted upon and of such long continuance, as to raise a fair presumption, that it was known to both contracting parties, and that they contracted in reference to and in conformity with it, but it must not control the express intention of the parties nor the interpretation and effect, which result from an established rule of law applicable to it, nor be inconsistant with a rule of the common law on the same subject. And such usage of a trade, in order that it may be regarded as incorporated into a contract, must be certain, general, known, reasonable and not repugnant to the contract nor to the rules of law. See *Randall* v. *Smith,* 63 Me. 106; S.

C. 18 Am. R. 200, and note; *Smith* v. *Gibbs*, 44 N. H. 336; *Haskins* v. *Warrans*, 116 Mass. 514; *Insurance Company* v. *Wright*, 1 Wallace 456 and 470.

The evidence, which was rejected by the court in this case, was introduced to establish a usage, which fell far short of these requirements of the law. I need not stop to point out the many defects in the usage attempted to be proven. That it would be a very unreasonable usage, I have already shown; and this alone would condemn it and justify the court in excluding it from the consideration of the jury.

It was urged, that the agreement in this case between the plaintiff and defendant proven by the evidence was void, because it was not, as required by the statute of frauds, in writing, it being "an agreement that was not to be performed within a year. (Code, ch. 98th, sec. 1, clause 7.) But the agreements contemplated by this provision of the statute of frauds are such, as by their terms or by the understanding of the parties when entered into were to have their performance postponed a year or more, and not such, as might or might not chance to be performed within that time. (*Jordan* v. *Miller*, 75 Va. 442, 450; *Chaffee* v. *Benoit*, 60 Miss. 34; *McPherson* v. *Cox*, 90 U. S. 404, 416; *Blakeney* v. *Good*, 30 Ohio State 350, 362; *Niagara Insurance Co.* v. *Greene*, 77 Ind. 590, 593.) As this agreement did not, when entered into, have its performance postponed a year or more, but might or might not continue one year or more at the option, to be afterwards exercised, of either party on reasonable notice to the other party, it did not come within the statute of frauds and was not by it required to be in writing.

It is also insisted by the counsel for the plaintiff in error, that the circuit court erred in refusing to act upon the instructions offered by the plaintiff after the conclusion of the arguments of the counsel on both sides before the jury. This refusal was based by the court on the eleventh rule of the court, which provides, that instructions offered at this stage of the case would not be entertained or considered by the court. This is a reasonable rule intended to facilitate the business of the court and to guard both the court and the counsel on the opposite side from injuries, and the enforcement of such reasonable rule by the circuit courts should be upheld by

the appellate courts, as has been done. (*Life Insurance Co.* v. *Francisco*, 17 Wall. 672, 679; *Brindville* v. *People*, 42 Ill. 221; *Haldin* v. *Dall*, 29 Cal. 556.) But though a circuit court adopts such a rule, it may under peculiar circumstances, when justice to the parties requires it, depart from its rule; and if under such circumstances, as ought to induce it to depart therefrom, it refuses to do so and will not entertain or consider proper and necessary instructions offered by one of the parties, after the argument is closed, it may be that the appellate court ought to review its action. (*People* v. *Garball*, 17 Mich., 10; *Billing* v. *McCoy*, 5 Neb. 187.) In this case the record shows the existence of no such peculiar circumstances or any reason why the rule of the circuit court should not be followed. But counsel for the plaintiff insists that this was not a rule of the circuit court of Ohio county, because it was adopted on May 19, 1877, when the court had but a single judge, and since the amendment to our Constitution this court has two judges, and they by their joint action have not adopted this rule, as it is claimed they should have done under the Acts of 1881, chap. 2, sec. 11. It is further contended that the circuit court of Ohio county in existence on May 19, 1877, which then adopted this rule, had been abolished by section 21 of the first amendment of the Constistitution. (Acts 1883, p. 194); and therefore the new circuit court of Ohio not having formally adopted this rule, it ceased to exist. There was, it seems to me, nothing in this constitutional amendment nor in this act of the legislature, which affected the continued validity of this rule. The circuit court of Ohio county was not abolished by the constitutional amendment, and such a rule as this would not cease to be operative until revoked by an order of the court. It never was so revoked, and as certified by the judge sitting at the trial of this case it had until and at the trial of this case always been observed in this court. There was no error in the circuit court refusing to consider these proposed instructions.

For these reasons the judgment of the circuit court of January 30, 1884, must be affirmed; and the defendant in error must recover of the plaintiff in error his costs in this Court and thirty dollars damages.

AFFIRMED.