# CHARLESTON.

DICKINSON FUEL COMPANY *v.* GLENN COAL COMPANY

(No. 5579)

Submitted March 2, 1927.    Decided March 15, 1927.

1.   EVIDENCE—*Self-serving Declarations in Absence of Adverse Party Are Inadmissible; in Action for Money Advanced Under Coal Sales Contract, Self-serving Statement by Witness That Coal Could Not be Sold as Certain Kind and Would Not be Sold as Any Other Brand Should Have Been Stricken.*

   Self-serving declarations made by one party in the absence of the other, should not be admitted in evidence; and if such declarations inadvertently creep into the evidence before the jury, they should be stricken out on motion, and the jury told to disregard them.   (p. 372).

   (Evidence, 22 C. J. § 193.)

2.   SAME—*After Admitting Letters Demanding Payment and Reciting Promises of Payment, Excluding Letter From Defendant Denying Liability Was Error.*

   Where plaintiff has introduced letters demanding from defendant payment of an account claimed to be due and payable, and reciting promises of payment on the part of defendant; it is error to refuse in evidence a letter from defendant to plaintiff denying liability on the account.   (p. 373).

   (Evidence, 22 C. J. § 163.)

3.   CONTRACTS—EVIDENCE—*Where Terms of Verbal Contract Conflict, Cirmumstances and Actions Thereunder Are Generally Admissible; on Controversy Whether Coal Was to be Sold as Certain Kind, Evidence of Prices Received Just Prior and Subsequent to Plaintiff's Agency, and Prices for*

*Similar Coal From Another Mine, Should Have Been Admitted.*

Where the basis of litigation is a verbal contract, and there is a sharp conflict as to its terms, the situation of the parties and all the circumstances surrounding them which tend to substantiate the evidence of either party as to the terms of the contract and its true meaning and effect, and what the parties did under the contract, is generally admissible as evidence.   (p. 374).

(Contracts, 13, C. J. §514; Evidence, 22 C. J. §§ 1570, 1590.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Kanawha County.

Action by the Dickinson Fuel Company against the Glenn Coal Company. Notice of motion for judgment. Judgment for plaintiff, and defendant brings error.

*Judgment reversed; verdict set aside; new trial awarded.*

*Brown, Jackson & Knight* and *Lilly & Lilly,* for plaintiff in error.

*Price, Smith & Spilman,* for defendant in error.

LIVELY, JUDGE:

In this action of notice of motion for judgment the plaintiff, the Dickinson Fuel Company, seeks to recover from the defendant, the Glenn Coal Company, $3,243.98, for money ''advanced'' under a coal sales contract. Upon the joinder of issue on defendant's pleas of non-assumpsit, nil debit, set-off, notice of recoupment and supplement thereto, the jury found for the plaintiff; and it was to the judgment entered on this verdict that defendant obtained this writ.

The amount claimed by the plaintiff arises out of a verbal contract made on Nov. 19, 1923, between the plaintiff fuel company, a coal sales agency, and the defendant coal company, which was engaged in operating the ''Black Band'' seam of coal. By this contract the plaintiff became the selling agent for all of defendant's coal. Before the termination of this agreement by the defendant on January 12, 1924, plaintiff ''advanced'' defendant the following sums for coal shipped; on Nov. 30, 1923, $5,000.00; on Dec. 14, 1923,

$6,500; and on Dec. 29, 1923, $5,500.00.  Plaintiff also charged back to defendant $157.37, representing sums refunded on short weight shipments to customers to whom it had sold defendant's coal.  All of these items mentioned made a total sum of $17,157.37.  From Nov. 20, 1923 until January 12, 1924, plaintiff sold for defendant 7,859 tons of coal, for which it received $13,913.39, after deducting its sales commissions, which amount when credited upon the $17,157.37 mentioned above, left a balance of $3,243.98 in plaintiff's favor, the amount of the verdict returned by the jury.

In its notice of recoupment defendant sets out the contract entered into between plaintiff and defendant in Nov. 1923, whereby the former agreed to sell six cars of coal then on the tracks at Detroit, at not less than certain specified prices for the different grades of coal; and defendant alleges that by the same contract the plaintiff agreed to sell for defendant all of its coal produced thereafter, for an indefinite period of time; that said coal was of a superior quality known as "Black Band" coal, and when offered on the market as such, it brought a price substantially in excess of that received for other coals produced in the same or neighboring coal fields; that at the time of the agreement mentioned plaintiff was engaged in selling "Black Band" coal for the Black Band Consolidated Coal Company, a producer of coal in the same vicinity as defendant's mine and which was mining the same seam of coal as that operated by defendant; that by the terms of said contract it was agreed that plaintiff would sell defendant's product as "Black Band" coal; that plaintiff would sell it to consumers exclusively and not to other agencies or brokers, and would procure for the defendant the same prices as those obtained by it for coal produced by the Black Band Consolidated Coal Company; "and by reason of which said contract and under the terms thereof it was the duty of the plaintiff to use reasonable diligence to sell said coal at the best price possible and at a price equal to the market value for black band coal of similar grade and quality;" for which service defendant was to be paid a commission of 8%.  Defendant then alleged a breach of all the duties heretofore

mentioned. A detailed statement of the prices which defendant received for its coal sold by plaintiff and the prices it should have received had plaintiff kept its contract, was made a part of the notice of recoupment, leaving a balance in defendant's favor, after crediting the sums "advanced" and paid out by plaintiff, of $3,102.44.

In its supplemental notice of recoupment defendant alleged that in the contract between plaintiff and defendant, the plaintiff agreed to sell defendant's coal direct to the consumer, and that no reconsignment charges, car service or demurrage charges should be incurred by plaintiff and charged to defendant; and that plaintiff had incurred such expenses and had improperly charged the same to defendant in the amount of $2,500.00.

The terms of the contract mentioned in defendant's notice of recoupment, are in dispute. According to the plaintiff's evidence, on Nov. 19, 1923, A. A. Lilly, president of defendant company, called upon C. C. Dickinson, president of plaintiff fuel company, at the latter's office in Malden, West Virginia, for the purpose of securing plaintiff to act as the sales agency for the disposal of defendant's coal. Mr. Dickinson, Joe Wehrle, Jr., a salesman for the plaintiff, and Mr. Lilly were the only persons present on this occasion. Dickinson and Wehrle testify that plaintiff agreed to sell defendant's coal production to the best advantage and return to the latter the proceeds of sales less 8% or a maximum of 15 cents per ton, the contract being the usual sales agreement. Lilly's understanding as to the terms of this verbal contract was quite different. He says the plaintiff agreed to sell defendant's product as "Black Band" coal, direct to consumers, at a price equal to that obtained by plaintiff for another of its customers, the Black Band Consolidated Coal Company, which also operated the Black Band seam of coal; and that plaintiff was to obtain the best and highest market price for defendant's product. Statements were to be sent to defendant company every fifteen days. Wehrle and Dickinson both deny that it was agreed that defendant's coal should be sold as Black Band coal. Dickinson says that it was pointed out to Lilly

.that plaintiff would be unable to do this because one of its customers, the Black Band Consolidated Coal Company, had applied for a trade mark on this name. Wehrle and Dickinson testify that other selling names for defendant's product were suggested, but that none was agreed upon, and Mr. Lilly having expressed the desire that defendant's coal should be sold without further delay, plaintiff sold the coal under the trade name of "Blue Ribbon." Mr. Dickinson also denied that the plaintiff had contracted to sell defendant's coal direct to consumers.

No statements as to the prices for which plaintiff had disposed of defendant's coal were rendered to defendant until January 10, 1924, when a statement was sent to defendant setting forth this information for the period extending from Nov. 20, 1923 to January 10, 1924. Upon receipt of this statement, which showed that defendant's coal had been sold at an average net price of $1.71 per ton, the defendant exercised its option and terminated the sales contract with defendant.

Defendant company introduced evidence showing that plaintiff had obtained much higher prices for the coal of the Black Band Consolidated Coal Company (one of the three companies operating the Black Band seam), than it obtained for defendant's coal, during the period extending from Nov. 20, 1923 to January 10, 1924. Evidence was also offered to the effect that under the terms of the contract plaintiff had agreed to sell defendant's coal as Black Band coal.

The errors assigned for reversal are that the court erred: (1) In the admission of certain evidence offered by plaintiff; (2) In the rejection of evidence offered by defendant; and (3) In the refusal to give defendant's instructions Numbers 2, 3 and 6.

The questions of whether plaintiff had agreed to sell defendant's coal as "Black Band" coal, and whether plaintiff company agreed to secure for defendant's coal a price equal to that obtained for the coal of the Black Band Consolidated Coal Company, were submitted to the jury by proper instructions, and the jury found in plaintiff's favor on both of these

issues. It is contended by defendant, however, that there was another issue which it was entitled to have submitted to the jury, namely; whether the plaintiff as sales agent of the defendant company performed the duty owed by it to defendant of using reasonable diligence to secure for its coal the best possible market price obtainable for Black Band coal of similar grade and quality. Defendant offered evidence on this question, but it was rejected, and defendant's instructions Nos. 2, 3 and 6, based on this theory, were likewise refused. The rejection of this evidence and the refusal to give these instructions will be considered together.

In determining these two assignments of error, it becomes necessary to examine the notice of recoupment to ascertain if it contains sufficient averments to permit the introduction of evidence to support this theory advanced by defendant. It is contended by plaintiff that the notice is insufficient in this respect. In the notice of recoupment, among other averments, there is contained the following: "And by reason of which said contract and under the terms thereof it was the duty of the plaintiff to use reasonable diligence to sell said coal at the best price possible and at a price equal to the market value for Black Band coal of similar grade and quality;" and, "that plaintiff did not exercise reasonable diligence to sell said coal at the best price possible or at a price equal to the market value for Black Band coal of similar grade and quality." Under our law a notice of recoupment is an informal means of notifying the opposing party of the defense to be relied upon, and it need not be so certain and as formal as a declaration. All that is required in order that it may fulfill its primary object—to prevent surprise—is that a defense relied upon therein should be so definitely stated as to put the opposing party upon notice. *Sterling Organ Co.* v. *House,* 25 W. Va. 64, 88. The defense now under discussion could have been stated more clearly and explicitly, but we think that the averments of the notice are definite enough to inform the plaintiff that one of the grounds relied upon for recoupment is the breach of the plaintiff's duty to use reasonable diligence to secure for defendant's coal the best possible market price

for Black Band coal of similar grade and quality. Therefore, it was error to exclude the testimony of defendant's witnesses as to the prices received by defendant for its coal just before it entered into the contract with plaintiff and just after the termination thereof, as tending to show the market value for Black Band coal of similar grade and quality during the time covered by the contract. Even though there had been a slump in the coal market during December, 1923, this evidence would have been of some aid to the jury in determining the market value of Black Band coal during this period of time. Likewise the evidence of the witness Ramsey, who was selling the same quality and grade of coal from a near by mine during the time of the operation of the contract, that is, between Nov. 20, 1923 and January 10, 1924, to the effect that he had received an average price greater than that received by plaintiff for defendant's coal, was admissible to aid the jury in determining the market price of Black Band coal during the contractual period, and as tending to show a breach of the contract on plaintiff's part, if defendant's version of the contract was found to be the true one by the jury. As will be pointed out later, this evidence above referred to was also admissible on another ground.

Although the notice of recoupment was broad enough to permit the introduction of the above mentioned evidence, yet we think defendant's instructions Nos. 2, 3 and 6, offered on this point, were properly refused. These instructions would have told the jury that the plaintiff as agent of the defendant company owed it the duty of using due diligence in marketing defendant's coal at the prevailing market price of said coal, and if they believed that plaintiff had failed to exercise due diligence in this regard, then they should give to defendant such damages as they may have believed it had sustained by such breach of duty. We believe the trial court ruled correctly in refusing to give these instructions, because they merely state an abstract proposition of law "without in any way connecting it with the evidence, or indicating what facts the jury must find from the evidence in order to make it applicable." *State* v. *Cantor*, 93 W. Va. 238. They were also

defective in that they did not confine the duty of the plaintiff to the exercise of due diligence in securing for defendant's coal the prevailing market price of *Black Band coal of similar grade and quality.*

Defendant assigns as error the refusal of the court to strike from the record the latter part of an answer made by C. C. Dickinson, President of defendant company, upon direct examination, as contained in defendant's bill of exceptions No. 3. The question and answer was as follows:

"Q. Did you enter into any contractual relations with him (Mr. Lilly, president of defendant company), representing the Glenn Coal Company and you representing the Dickinson Fuel Company sometime in November, 1923, in regard to the sale of their coal?"

"A. During the early part of November and even earlier Mr. Wehrle, one of the men employed by me, told me that General Lilly was anxious to have us sell his coal. I replied to Mr. Wehrle in each instance that we could not sell that coal as Black Band coal and would not sell it at all even under any other brand."

While it is perhaps true that the party adverse to the examiner has not an absolute right to have an answer stricken from the record as not being in response to a question, yet we think the refusal to strike out the latter part of the witness' reply was prejudicial to defendant; for not only was it not responsive to the question asked, but it was also improper as containing a self-serving declaration. It is true that in the next question propounded, plaintiff's counsel told the witness not to state his conversation with Mr. Wehrle, but it is doubtful if this was sufficient to remove the impression created by the court's refusal to strike this objectionable testimony from the record. Dickinson and Wehrle later testified that plaintiff had not agreed to sell defendant's coal as Black Band coal, but the manner in which Dickinson stated this fact in the answer objected to, coupled with the assertion that he had told Wehrle that plaintiff would not sell the coal under any brand, tended to strengthen his claim in that regard, and this result was accomplished in violation of well established rules of evi-

dence. This ruling of the trial court was prejudicial to defendant.

Defendant also assigns as error the introduction of several letters written by plaintiff to defendant, covering a period from June 10, 1924 to October 24, 1924, and the rejection of a letter written by the latter to the former. This correspondence is incorporated in defendant's bill of exceptions No. 4.

On April 9, 1924, plaintiff company rendered a statement to defendant showing the account then existing between them, and requesting prompt payment thereof. Plaintiff's letters set out in bill of exceptions No. 4 were written to A. A. Lilly, president of defendant company. In this correspondence references were made to the account rendered on April 9th, and defendant's promises to settle same by payment or notes given in lieu of cash payment. After the admission of these letters, Dickinson, president of plaintiff company, was asked if he had received any answer from defendant, and he replied that he had not. But on cross-examination he admitted the receipt of a letter from Mr. Lilly stating his reasons for nonpayment of plaintiff's claim. Defendant then offered in evidence this letter written by Mr. Lilly as president of the defendant company, on Nov. 20, 1924. The trial court took the view that plaintiff's letters were admissible, but that the letter offered by defendant was not evidence; that it was Mr. Lilly's view on the merits of the case, and he was present to testify as to that.

While several of these letters written by plaintiff were somewhat vague as to their subject-matter, yet it is sufficiently clear that they were intended to refer to the account rendered defendant on April 9, 1924; and therefore they probably were competent evidence, because the failure to reply thereto might be considered to be indicative of acquiescence in the statements contained therein. *Murphy* v. *Gates*, 81 Wis. 370. But if these letters were admissible, then defendant's letter of Nov. 29, 1924, was likewise competent evidence. It concerned the same subject-matter referred to in plaintiff's letters—the account existing between the parties. Defendant company was entitled to have this written denial of liability go to the jury to

rebut the presumption of acquiescence in the contents of plaintiff's letters. However, defendant was not entitled to have the whole of this letter read to the jury, because it is rather in the nature of a brief for defendant's side of the case, and consists largely of self-serving declarations; but that portion of the letter contained in the first paragraph, directly denying liability on the account referred to in plaintiff's letters, was competent evidence. It is true that the necessity for the admission of this letter was largely obviated in the instant case by Dickinson's acknowledgment of its receipt and his acknowledgment that it denied liability on plaintiff's claim, but the better practice would seem to sanction its admission in evidence.

As mentioned heretofore, defendant offered, but was refused, evidence to show the prices it received for its coal just prior to the time plaintiff began selling it as agent, and also evidence of the prices it received for its coal just subsequent to the termination of the contract; also evidence of the prices received by a mine in the near vicinity which produced and sold the same coal, said prices being received during the same period in which plaintiff sold defendant's coal. Was this evidence pertinent to the issue? As before observed, the controversy arises over the terms of the contract, the main difference being whether the coal was to be sold as Black Band coal, which brought from fifty to seventy-five cents more per ton than other high volatile coals, or whether it was to be sold under some other name. Defendant affirms that it was to be sold as Black Band, while plaintiff denies that such was the contract. Defendant's notice of recoupment stresses plaintiff's failure to sell the coal for the same price it received for Black Band, and lack of good faith and fair discretion in not obtaining a price equal to that obtained for coal similar in quality and grade. This evidence refused would have tended to substantiate defendant's version of the terms of the contract, for it would be rather unusual for defendant to agree to place its coal on the market at a price ranging from fifty to seventy-five cents per ton less than it was then receiving. It is true that the jury adopted plaintiff's version of the con-

tract, and said by its verdict that plaintiff did not agree to sell the coal as Black Band. But would they have so found, had the proffered evidence been before them? Was the refusal prejudicial? Where there is a sharp conflict as to the terms of a verbal contract, or where the contract if written is ambiguous, the facts and circumstances leading up to its formation and which will tend to establish the contention of either party, or make clear any ambiguity in the agreed terms, are generally admissible. The price which defendant was receiving for its coal, if greater than that for which plaintiff sold it immediately after taking the agency, however slight, would tend to buttress defendant's version of the agreement; likewise, the average prices received for similar coal during the time of the agency, under the same market conditions, if greater than that received under the contract, would be evidence of a breach of the contract under its terms as contended for by defendant. And the same may be said of prices received for defendant's coal immediately after the termination of the contract. The proffered evidence we hold was admissible to assist the jury in arriving at the basic question, namely; what were the terms of the contract? *Holcombe* v. *Coal Co.,* 96 W. Va. 473. "Where the testimony upon a vital issue is contradictory, evidence of collateral facts tending to show which statements are the more probable, reasonable, or credible may be admitted in the discretion of the court." Vol. 2, Jones Commentaries on Evidence (2nd Ed.), Sec. 603, page 1116. "Where there is a direct conflict in the evidence of the witnesses relating to a material issue in the case, any collateral fact or circumstance tending in any reasonable degree to establish the probability or improbability of the fact in issue is relevant evidence and proper for the consideration of the jury." *Shepherd* v. *Lincoln Traction Co.,* 79 Neb. 834, 113 N. W. 627.

The judgment will be reversed, the verdict set aside and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*